FILED                    RECEIVED
ENTERED                  SERVED ON
                         COUNSEL/PARTIES OF RECORD

**JUL 1 0 2019**

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY:_____ DEPUTY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
LAS VEGAS DIVISION

ERIC EHMANN,

      Plaintiff,

V.

**2:19-cv-01199-APG-BNW**

DESERT PALACE, LLC,
a Domestic Corporation,
dba Caesars Palace,

    And

JURY TRIAL DEMANDED

PARIS LAS VEGAS OPERATING COMPANY, LLC,
a Domestic Corporation,
dba Paris Las Vegas,

    And

AMERICAN GAMING ASSOCIATION, INC.,
a Foreign Corporation,

      Defendants.

## COMPLAINT

## INTRODUCTION

1. This is an action to recover economic losses resultant of fraudulent and tortious conduct of Defendants, and to restrain Defendants from engaging in fraud and other unlawful conduct in the future.

2. This action alleges violations of Nevada Revised Statutes, Chapters 205.377 and 598.0993 through 598.0999, inclusive, and the provisions of Chapter 96 of Title 18 U.S.C. §§ 1961 through 1968, entitled Racketeer Influenced and Corrupt Organizations ("RICO"), including allegations that two casino operators and one casino gambling-related trade organization violated section 1962(c) and (d) of RICO. Those subsections

make it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity", or to conspire to do so.

3. This complaint alleges that Defendants violated and continued to violate RICO by joining together in a decades-long conspiracy to deceive the American public about the risks, addictiveness, and consequences of casino gambling. Specifically, Defendants have undertaken to repeatedly and consistently:

   a. assert that winning at casino gambling is determined by skill, luck, and chance;

   a. deny or conceal knowledge that casino gambling is inherently addictive;

   b. deny or conceal knowledge that they have, or could have, any ability to identify patrons who have a gambling disorder, ("problem gamblers");

   c. attempt to publicly discredit studies whose findings contradicted their assertions and denials relating to these issues or, generally, the risks of casino gambling;

   d. willfully conceal from patrons and the public the actual odds of winning the wagers they accept in their casinos;

   e. purposefully work to engineer and market casino games that are as addictive as possible; and

   f. market or promote casino gambling to children.

4. Even though Defendants have long understood the risks of casino gambling and could have developed and marketed casino gambling in ways that would have informed their patrons and the public about the facts concerning those risks, Defendants chose and conspired not to do so. Instead, they have knowingly marketed casino gambling so that the public is fraudulently enticed to participate in an activity which Defendants have unlawfully manipulated and misrepresented over a course of decades in order to reap hundreds of billions, if not trillions, of dollars in unjust profits.

5. In all relevant respects, Defendants acted in concert with each other and their co-conspirators in order to further their fraudulent scheme. Beginning not later than 1994, Defendants, their various agents, employees, and associates, and their co-conspirators, formed an "enterprise" (the "Enterprise") as that term is defined in 18 U.S.C. § 1961(4). The Enterprise has functioned as an organized association-in-fact for at least the last 25

years to achieve, through illegal means, the shared goals of maximizing casino gambling profits and avoiding the consequences of their actions. Each Defendant has participated in the operation and management of the Enterprise and has committed numerous acts to maintain and expand the Enterprise.

6. In order to conceal their fraudulent conduct and avert detection, Defendants have engaged in a scheme to make false and deceptive statements to the public and governmental or judicial authorities, while concealing information and research that they knew would have exposed their public campaign of deceit.

7. Defendants' unlawful conduct has caused unquantifiable injury to, and wreaked immeasurable adverse consequences on, casino patrons and the public. Americans who have engaged in casino gambling in at least the last 25 years have suffered a host of injuries ranging from immediate and long-term economic harm to emotional pain and suffering, mental health disorders, and suicide. The effect of Defendants' fraudulent activities and unlawful scheme continues to this day, and unless they are held to account by this Court, Defendants are likely to continue their conduct in the future.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 18 U.S.C. §§ 1964(a) and (c), in part because this Complaint alleges violations of 18 U.S.C. §§ 1341, 1343, and 1961 through 1968, and is brought pursuant to 29 U.S.C. § 216(b).

9. Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants reside in and have principle places of business in this District, and because the events giving rise to the claims in this Complaint occurred predominantly in this District.

## PARTIES

10. Plaintiff, ERIC EHMANN, ("Mr. Ehmann"), is an adult resident of Appleton, Wisconsin.

11. Defendant, DESERT PALACE, LLC, doing business as Caesars Palace, ("Caesars"), is a Nevada company with a principal place of business at 3570 South Las Vegas Boulevard, Las Vegas, NV 89109. Since its formation, Caesars has had numerous affiliates and/or owners and/or parent companies, and at relevant times it and/or its owner(s) and/or

parent(s) have engaged in the business of casino gambling and/or other forms of wagering at numerous properties throughout the United Sates, including in Las Vegas. At all relevant times, Caesars, individually and through its agents, alter egos, subsidiaries, divisions, employees, and officers, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

12. Caesars' registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

13. Defendant, PARIS LAS VEGAS OPERATING COMPANY, LLC, ("Paris"), is a Nevada company with a principal place of business at 3655 South Las Vegas Boulevard, Las Vegas, NV 89109. At all relevant times, Paris has engaged in the business of casino gambling in Las Vegas. Beginning not later than 2005, Paris has been owned and/or controlled by Caesars and/or an affiliate, division, owner, or parent of Caesars, or some combination thereof. At all relevant times, Paris, individually and through its agents, alter egos, subsidiaries, divisions, employees, and officers, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

14. Paris' registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

15. Defendant AMERICAN GAMING ASSOCIATION ("AGA"), is a Washington, DC, non-profit corporation whose registered agent for service of process in the state of Nevada is Lavonne Withey, 4012 Dustin Avenue, Las Vegas, Nevada 89120.

16. AGA is not primarily a "research" organization but was established by a coalition of casino operators, casino industry executives, and casino employees or agents, including Caesars and/or its agents, officers, owner(s), parent(s), and/or affiliates, to carry out its fraudulent course of conduct, beginning in 1994. At all relevant times, AGA operated as public relations and lobbying arms of the Defendants and their co-conspirators, and as

agents and employees of same. It also acted as a facilitating agency and co-conspirator in furtherance of the conspiracy as described in this Complaint. In acting as alleged herein, AGA acted within the course and scope of its agency and employment, and with the knowledge, consent, permission, and authorization of the other Defendants and their co-conspirators. All actions of AGA were ratified and/or approved by various agents, officers, and/or representatives of the other Defendants and/or their co-conspirators. At times pertinent to this Complaint, AGA, individually and through its agents, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other Defendants and/or their co-conspirators in the unlawful, misleading, and fraudulent conduct alleged herein, and have affected interstate commerce in the United States.

17. Caesars, Paris, and AGA are referred to herein collectively as "Defendants".

18. At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. §1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

## **BACKGROUND**

19. Mr. Ehmann began gambling at Las Vegas casinos operated by Caesars and Paris in April of 2002 and continued doing so intermittently up until April of 2018. Mr. Ehmann played blackjack and slot machines almost exclusively, but on occasion played other games as well. Mr. Ehmann believed at all relevant times that by employing the "correct" strategy and bankroll management, and by making the "correct" gameplay decisions, he would be able to consistently win at casino games. Over the course of thousands of hours, Mr. Ehmann has lost more than one million dollars gambling. Prior to becoming a casino gambler, Mr. Ehmann had never before broken the law, or even considered doing so, until he became so desperate after losing all of his money at the blackjack tables that he feared his girlfriend would break up with him and he would become homeless, which led him to begin committing various financial crimes in order to fund his casino gambling in a desperate attempt to win back not only the money he had lost, but the money he had stolen. Mr. Ehmann spent five years in federal prison for his crimes, but he has since

made full restitution including interest. Mr. Ehmann last played blackjack and slot machines at Caesars in Las Vegas on April 21, 2018.

## GENERAL ALLEGATIONS

20. Casino gambling is one of the most popular past times in American culture. The United States has more than 1,000 casinos across 40 states, which attract millions of gamblers and generate billions of dollars in profits for casinos, each year.

21. Studies have shown that up to 20 percent of all adult gamblers in the United States are problem gamblers, while up to half of them are clinically pathological – numbers far exceeding the number of U.S. adults who have serious alcohol problems – and that problem gamblers account for up to 60% of the gambling revenue of American casinos.

22. The casino games that Defendants market and engage in are represented by Defendants and their co-conspirators as being honest games of integrity in which "luck", "chance", or "skill" determine success, despite Defendants' knowledge that they, "the house", have a statistically insurmountable mathematical advantage which no amount of luck, chance, or skill can overcome.

23. The casino games offered by Defendants, including particularly electronic gambling machines such as "slot machines" and "video poker" machines (among others), are intentionally engineered to be as addictive as possible, exploiting psychological and physiological vulnerabilities in order to facilitate and prolong compulsive behavior, conditioning and enticing patrons to gamble, and continue gambling, even (and especially) when consistently and unavoidably losing.

24. The multitudinous brightly lit, blinking, flashing, chiming, and enticing electronic gambling machines which are prominently featured throughout Defendants' casinos frequently and regularly promote enormously large jackpots which, in fact, players rarely, or never, actually win, while the actual odds of winning are never disclosed to patrons.

25. In about the early 1980s, with the advent of computer technology resulting in the development of new types of electronic slot machines, the odds of hitting the jackpot on a typical slot machine went from approximately 1 in 11,000 to 1 in 130,000,000, an order of magnitude effectively on par with the odds of hitting an interstate mega lotto jackpot. These odds, however, were not, and are not, disclosed to patrons.

26. Today's electronic gambling machines are capable of being tele-connected via computer networks that allow different casinos in different locations, including in different states, to pool the proceeds from networked machines in order to advertise larger-than-usual jackpot prizes to patrons across state lines. Beginning no later than 2014, Caesars and its affiliates offered at least one such networked electronic gambling game to patrons in both Nevada and New Jersey.

27. For at least the last 25 years, Defendants and/or their agents, associates, and co-conspirators have conducted extensive research into the psychology and physiology of gamblers, including specifically the emotional and physical responses gamblers experience when winning and losing, along with the effect the casino environment itself has on gamblers, as well as the effectiveness of perks, promotions, and so-called "complimentaries" (or "comps") that gamblers receive from casinos, all of which is analyzed and applied by casinos, including Caesars and Paris, in order to maximize the sums of money patrons wager, and the frequency and duration patrons gamble, even when consistently losing. Defendants engage in these tactics without ever disclosing to patrons the actual odds of winning.

28. Beginning in about the early 1990s, as public and legal scrutiny of American cigarette manufacturers intensified as a result of decades of gradually increasing public awareness of the health risks of smoking and increasing questions about cigarette companies' knowledge and denial of those risks, and their potential liability, casino operators realized that the changing social and legal climates in the United States could lead to scrutiny of their own conduct and eventually pose an existential threat to their business model, so a coalition of casino industry executives, owners, and investors undertook a series of meetings for the purpose of developing a strategy of pre-empting the legitimacy of any such scrutiny and neutering any potential existential threat.

29. Toward that end, the co-conspirators, including Caesars and/or its affiliates, formed the American Gaming Association, in 1994. The AGA presently describes itself on its website as: "Dynamic. Thriving. Responsible. We are the united casino gaming industry. Accomplishing greater innovation and growth together." It goes on to state the following: "The adrenaline of chance. The excitement of winning. The assurance of Integrity. Effective consumer protections enable our patrons to confidently enjoy responsible

entertainment experiences. Gaming companies invest over $300 million annually in responsible gaming programs, and a deeply rooted culture of compliance ensures our industry upholds the highest standards of fairness and transparency."

30. Presently, the AGA's board of directors is described on its website as "Leaders from across the industry who convene regularly to discuss a wide range of issues affecting the current and future state of casino gambling", and includes Christian Stuart, identified as the EVP of Gaming & Interactive Entertainment for Caesars Entertainment (which is an affiliate and/or owner or parent of Caesars), and John Payne, identified as the President and COO of VICI Properties (which is an affiliate and/or owner or parent of Caesars and/or Paris and/or their owner or parent). Other board members identified include an executive from Boyd Gaming, a company which engineers and/or manufactures many of the electronic gambling ("slot") machines marketed to patrons at Caesars and Paris.

31. The Enterprise has acted through the AGA to pay lip service to promoting "responsible" gambling by means of policies, research initiatives, and statements that, on the surface, may appear to demonstrate a sincere effort or desire to stem the prevalence of problem gambling but which in fact ring hollow, such as by the AGA's 2017 announcement of a new "code of conduct" aimed at "consumer protection" which, while generating positive news coverage favorable to their reputation, in fact didn't amount to a comprehensive strategy with any verifiable effect. Similarly, the National Center for Responsible Gaming (the putative research arm of AGA, formed in about 1996), offers a pamphlet on its own website, entitled "Talking with Children About Gambling", which again, on the surface may seem like a good-faith effort, but which in substance falls far short of addressing the actual risks and realities of gambling and its consequences, including by neglecting to acknowledge the casino gambling simulation game software the Enterprise creates and markets to children, and far less discouraging its use by children).

32. Defendants and their co-conspirators are fully aware that gambling addiction is stronger than mere habit formation, and that the majority of problem gamblers wish that they did not gamble. Despite this knowledge, Defendants have made numerous statements trivializing and outright denying both the dependence casino gambling causes, as well as their responsibility and ability to recognize it and, much less, enact policies and practices designed to effectively reduce the level of profits they reap from problem gamblers.

33. In a 2013 article in the Wall Street Journal, Caesars' CEO Gary Loveman stated, "I think it's a terrible idea" to engage in any effort to identify problem gamblers, further adding, "Is it McDonald's obligation to decide you have a problem because you have a tendency to eat high-calorie lunches? You could take this to ridiculous extremes." Caesars' spokesperson Jan Jones Blackhurst was also quoted in the same article as stating that the idea that Defendants could, or should, identify problem gamblers was "hogwash". Geoff Freeman, president and CEO of AGA, is quoted elsewhere as stating, "There is a set standard to determine [alcohol] inebriation. Nothing of that sort exists to measure what the level is to have gambled too much."

34. However, not only does the American Psychiatric Association in its current, publicly available, Diagnostic and Statistical Manual-V establish easily identifiable, specific factors constituting gambling disorders, but Defendants themselves facilitate at least half of the criteria necessary for such a diagnosis merely by extending casino credit to patrons who have just lost their money gambling. According to John W. Kindt of the University of Illinois, writing for the Mercer Law Review, "any gambling facility granting credit (particularly over $200) to a [gambler] has actual or constructive knowledge that the gambler is problematic." On information and belief, both Caesars and Paris extend casino credit in amounts over $200 to numerous patrons on a daily and ongoing basis.

35. The long-articulated position of Defendants and their co-conspirators is that the blame for any adverse consequences of casino gambling lies solely with individual gamblers, and it turns out that the industry-funded studies undertaken or sponsored by AGA and/or NCRG and/or recipients of their funding overwhelmingly favor Defendants and their co-conspirators in affirming that position, while ignoring or neglecting to study the actual effects casino gambling has on individuals and communities. Critics have pointed out that NCRG's research has focused almost exclusively on peripherally-related or ancillary issues, such as neurobiology, genetics, relapse rates, brain imaging, and drug treatment, while ignoring urgent social issues critical to setting public policy, such as gambling's role in, or effect on, bankruptcy, divorce, crime, and suicide, or its overall effect on communities in which casinos operate.

36. Presently on the AGA website is a page entitled, "U.S. Casino Gaming's Local Economic Impacts", under which it states, "Our research brings forward data and expert

perspectives to educate elected officials, community leaders, and the public at large about casino gaming's positive economic impact." On another page in the "Research" section of the website it states, "The gaming industry remains a powerful economic engine and a dynamic job creator." The site prominently features a "Fact Sheet", dated February 13, 2019, entitled, "Responsibility in Gaming Survey", which asserts that "90 Percent of Casino Visitors Practice Responsible Gaming", before listing facially implausible findings that 90% of all casino gamblers essentially engage in nothing but responsible casino gambling in all conceivable ways. As Joanna Franklin of the National Council on Problem Gambling is quoted as saying in reference to the NCRG, "They're not going to fund anything that's going to hurt them, or that has the potential to hurt them."

37. However, and in stark contrast to statements from members of the Enterprise, legitimate, peer-reviewed scientific studies (that were not funded or undertaken by members of the Enterprise) have identified causal links between the way casino games are (purposefully) engineered and both the rates of problem gambling and the severity of its adverse consequences. Such studies consistently conclude that it is possible to both minimize the creation of problem gamblers as well as identify them, in part because casinos, including Defendants, are already equipped with the means to do so by way of the player-tracking systems they already have in place and which they use to dole out comps for the purpose of encouraging, prolonging, and maximizing patrons' gambling (i.e., losses).

38. After a study by the University of California at San Diego identified higher rates of suicide in Las Vegas as compared to comparable American cities which don't have casino gambling, AGA's founding president, Frank Fahrenkopf, commissioned research to discredit that study. After a study by the University at Buffalo's Research Institute on Addictions concluded that the rate of problem gamblers in the US is twice that of alcoholics, members of the Enterprise publicly decried the findings as flawed or wrong.

39. The decisions made by members of the Enterprise and its co-conspirators, including casino executives, agents, affiliates, owners, parents, and investors, beginning no later than with the creation of the AGA in 1994, have shaped the actions of the casino industry (including those of casinos that didn't exist in 1994, such as Paris), to this day, and both the Enterprise and the unlawful conspiracy that was created, and of which Defendants are a part, still continues.

40. The fundamental goal of the Enterprise and its conspiracy was and is to preserve and expand the market for casino gambling, and to maximize Defendants' profits. To achieve these goals, the Enterprise's strategy was and is several-fold and includes agreements among its members to:

    a.  conceal from patrons and the public the actual odds of winning;

    b.  refrain from advertising one casino's "house rules" (i.e., the rules of the games) as more favorable to gamblers than the rules of other casinos;

    c.  share aggregate player data with each other and their co-conspirators, including technology companies, for the purpose of engineering the most-addictive product possible;

    d.  use, in communications and statements Defendants caused and/or knew to be transmitted via wire and/or through the mail, the word "gaming" as a more-attractive and less controversial or risky-sounding alternative to the word "gambling", in marketing and promoting casino gambling;

    e.  respond, in communications and statements Defendants caused and/or knew to be transmitted via wire and/or through the mail, to scientific evidence of the risks and consequences of casino gambling with fraud and deception; and

    f.  focus their promotions and advertisements, in communications and statements Defendants caused and/or knew to be transmitted via wire and/or through the mail, on glamor, luxury, and entertainment aspects of casino properties, while minimizing or concealing the true profit-driver of casino business – gambling – and its risks and consequences, in the same way tobacco companies marketed their dangerous products because, like tobacco companies, casinos seem to recognize the need to provide a psychological crutch and self-rationale for gamblers to continue gambling.

41. For a period of decades up until about 2018 or early 2019, Caesars published and distributed through United States Postal Service mail its own magazine, entitled either "Vegas Player", or "Caesars Player", which Caesars used as an instrument for deceptive and misleading marketing and promotion in furtherance of the Enterprise.

42. For a period of decades beginning no later than about the late 1990s, Caesars published, or caused to be published, a variety of print advertisements in various magazines, which

Caesars intended, and knew to be, distributed through United States Postal Service mail, and which Caesars used as an instrument for deceptive and misleading marketing and promotion in furtherance of the Enterprise.

43. For a period of years beginning no later than about 2010 and up until today, Caesars established its own content channel on the YouTube website, through which Caesars published or caused to be published numerous video advertisements which Caesars intended, and knew to be, broadcast over wires via the internet, and which Caesars used as an instrument for deceptive and misleading marketing and promotion in furtherance of the Enterprise.

44. For a period of years preceding, and up until today, Caesars and Paris have established and maintained websites, which Defendants published or caused to be published and which Defendants intended, and knew, to be accessible over wires via the internet, and which were used as instruments for deceptive and misleading marketing and promotion in furtherance of the Enterprise.

45. For a period of years beginning no later than about 1991 and continuing up until today, Caesars and its co-conspirators have intentionally and deceptively marketed casino gambling to children throughout the United States by means of wires and mail, and have affected interstate commerce. The Enterprise's efforts began no later than about 1991 with the release of a series of several officially-licensed "Caesars Palace"-themed gambling simulation video game software products for use with computers and a variety of video game consoles including the Nintendo Entertainment System, Sega Genesis, and Game Gear, among others. This series of gambling simulators was released and sold throughout a period of several years. These gambling simulators came with either no age recommendation or, if they did, the recommendation was that they were appropriate for "kids to adults", and as such were marketed to children in video game magazine advertisements that Caesars (and/or its affiliate, owner, or parent) caused and knew to be distributed through the mail, and intended and knew to be sold to children in stores across the United States. Beginning no later than about 2011, the Caesars Palace brand has been licensed to, and/or is used with permission by, software development company, Playtika (which is owned by Caesars and/or its affiliate, owner, and/or parent), which develops and markets a range of gambling games (or "apps") that are marketed over wires via the

internet, and are available for download and use over wires via the internet through mobile devices such as, e.g., the Apple Store on Apple devices including the Apple iPhone. The recommended age for these gambling simulations, which is displayed on the software download page, is 12 years and up. In furtherance of the Enterprise, these gambling simulators are designed to promote casino gambling among, and are marketed directly to, children.

46. Rather than provide full disclosure to the public and in governmental or judicial proceedings about what they knew about the risks and consequences of casino gambling, Defendants and their co-conspirators determined, in furtherance of their Enterprise and conspiracy, to deny or minimize the risks and consequences of casino gambling and to maintain such positions that, for example, casino gambling is akin to eating Big Macs, despite having knowledge of not only the inherent addictiveness of casino gambling, the prevalence of problem gambling, and the portion of Defendants' gambling revenues that come from problem gamblers, but also of Defendants' own efforts to manipulate the development, marketing, and delivery of casino gambling in deceptive ways that exploit the psychological and physiological vulnerabilities of patrons.

47. Defendants and their co-conspirators sought to ensure that no casino company broke ranks from their public posture, which was based on falsehood and deception. If any casino company acknowledged the actual risks and consequences of casino gambling, or admitted that they intentionally engineered and marketed casino gambling in fraudulent and dishonest ways in order to maximize profits, or admitted the prevalence and preventability of problem gambling, including the fact that problem gamblers could be effectively identified and denied service, or acknowledged a causal relationship between problem gambling and various adverse consequences including rates of suicide, or admitted that casino gambling is inherently addictive, or that Defendants' research commitment was a sham, the conspiracy would be endangered. To further protect the Enterprise, their conspiracy, and their profits, Defendants made false and misleading statements to the public and in governmental or judicial proceedings, whether through press releases, advertising, or statements, which they did over wires and by use of the mail, and in doing so adhered to their common scheme of deception and falsehood

including by, among other things, concealing information which they knew to contradict their statements.

48. Defendants design, engineer, market, promote, and engage in what, for lack of a better word, can be described as a product – casino gambling – which, when patrons engage with that product as Defendants intend, causes an inordinately large percentage of users to become addicted and/or to sustain unreasonable and unforeseeable injuries.

49. The true nature of the risks and consequences of casino gambling were and are beyond that reasonably contemplated by the ordinary casino patron, and in particular beyond that contemplated by the ordinary first-time patron who is not yet dependent upon gambling. Moreover, the true risks of their products, as designed, engineered, and marketed by Defendants, were and are not open or obvious to their patrons, or the public.

50. Because Defendants have had available to them means to reduce the risks and consequences of casino gambling but chose not to develop or effectively implement them, the extreme risks of the design of casino games (and, particularly, electronic gambling "slot" machines) engineered and/or marketed by, and/or in association with, Defendants, substantially outweighed the utility of their design. Defendants failed to use reasonable care or honestly assess and acknowledge the risks of casino gambling in order to market their product with actual integrity by informing patrons and prospective patrons of their actual odds of winning, among other things.

51. Defendants' breach of their duties and willful deceit was done in reckless and wanton disregard of the risks to their patrons, and with actual or constructive knowledge of the fact that their conduct would cause serious injuries to large numbers of their patrons.

52. Defendants, along with their co-conspirators, deliberately and voluntarily made statements to the public and to governmental or judicial authorities, agencies, public officials, and others who advance and protect the public interest, in which they made the following undertakings:

    (a) to accept an interest in the public's well-being and responsible use of their product as a basic and paramount responsibility;

    (b) to cooperate closely with those who safeguard the public well-being in these regards;

    (c) to aid and assist the research effort into all aspects of casino gambling and its risks;

    (d) to continue research and all possible efforts until all the facts are known; and

    (e) to provide complete and authenticated information about the risks of casino gambling and its consequences for individuals and society.

53. Defendants, therefore, have assumed and affirmatively acknowledged a duty to disclose to governmental agencies, the public, and their patrons material facts concerning casino gamblers and the risks of casino gambling, including material facts about the odds of winning and the causes and prevalence of problem gambling, but instead Defendants have concealed their own manipulation of information relating to those matters, and concealed the facts concerning their own fraudulent marketing, promotion, and presentation of casino gambling.

54. Defendants' statements were made to reassure the public of the honesty and integrity of their product, while Defendants' commitment to ensure that their product was marketed as responsibly as possible while minimizing to the fullest reasonable and practicable extent the adverse consequences of the use of their product. In fact, however, Defendants had no intention of determining or disclosing the actual risks of their product, advising their patrons or the public of those risks, or ensuring that their product was marketed in the most-responsible, honest way. Defendants, acting in concert, used their promises to gain credibility for their false and misleading statements, and intended to create a false controversy about the risks and consequences of casino gambling.

55. Defendants intended that patrons, the public, and government or judicial officials would rely upon them to fulfill their publicly stated commitment and recognized or should have recognized that truly independent research and full disclosure, consistent with their publicly stated commitment, was necessary to protect the patrons and potential patrons of casinos. Defendants realized that their conduct would affect the gambling choices and behavior of millions of Americans.

56. Defendants have failed to exercise reasonable care in the performance of their undertaking. Rather than engaging in or funding earnest, good faith, comprehensive research to determine the actual consequences and risks of casino gambling, Defendants along with their co-conspirators deliberately designed and funded a putative research program so as to avoid determining the full scope of the dangers posed by their product, and acted to suppress or even terminate research that threatened to expose the risks and addictiveness of casino gambling. Through their failure and suppression, they have breached and continue to breach their assumed duties. Defendants' failure to exercise reasonable care has increased, and continues to increase, the risk of injury to patrons and potential patrons, and indeed collateral injury to the public at large.

57. Defendants and their co-conspirators have made false promises to conduct and disclose objective research on the issue of so-called "responsible gaming", but they have fraudulently

concealed information relating to the risks of casino gambling and its detrimental effects on individuals and society, including the actual odds of winning and the fact that the casino gambling games offered by Defendants are intentionally engineered to be addictive.

58. Defendants have failed to promote, be guided by, or even acknowledge the American Psychological Association's definition of addiction, as described in DSM-V, and further refuse to admit that casino gambling itself creates and sustains addiction, or acknowledge that the reason people develop gambling addiction is not a failure of will power but precisely because of the addictive nature of gambling and, especially, the addictive nature of casino gambling resultant of Defendants' and/or their co-conspirators efforts and conspiracy to willfully engineer and manipulate casino gambling to maximize its addictiveness and profitability.

59. Defendants and their co-conspirators have made affirmative material misrepresentations, have omitted material facts, and have concealed material information concerning the risks associated with casino gambling, particularly with respect to the actual odds of winning. They have made false and misleading statements and concealed material information concerning the prevalence of problem gambling and their own ability to either recognize, or mitigate the prevalence of, problem gamblers, from whom they earn a majority of their gambling profits. At the time that these false or misleading statements and representations were made, Defendants and their co-conspirators knew or should have known that their statements were materially fraudulent, false, or misleading, and that they intentionally omitted or concealed material information. Additionally, or in the alternative, Defendants and their co-conspirators made the statements recklessly and with willful disregard for the accuracy or truthfulness of their representations.

60. Defendants' statements and omissions as described herein concern material information because patrons, or prospective patrons, when deciding whether to gamble, must resolve initial reservations (or lingering qualms) about their chances of winning, the potential for monetary loss, the risk of addiction, and the risk of consequences that might affect their finances, their livelihood, their family, their friends, and others. Defendants' prevarications, misleading and/or false statements, and concealment concerning each of these issues suggests full awareness of the obvious fact that reasonable consumers interested in engaging in casino gambling would consider these statements important.

61. Defendants and their co-conspirators have had unique (if not exclusive) access to information relating to gamblers' behavior and, more broadly, casino gambling and its risks and

consequences, and have made public promises to be forthcoming with such information, but instead have made misleading, partial, or false disclosures relating to such information.

62. Defendants and their co-conspirators have committed countless acts involving material fraudulent misrepresentations, fraudulent concealment, and fraudulent nondisclosures over the course of at least the last 25 years, by various means including wire transmissions and distribution through the mail. Defendants' and their co-conspirators' acts of concealment took a number of forms, many of which are unknown to Plaintiff because such actions and concealment are within the exclusive knowledge of Defendants and have not yet been either publicly reported or exposed through discovery in the context of litigation. Plaintiff is unable to fully allege in detail the numerous advertisements, press releases, and other communications that Defendants and their co-conspirators have released and engaged in over the past 25 or more years because Plaintiff does not have access to this information. However, Defendants themselves are in the best position to know the contents of each and every such misrepresentation and fraudulent statement, and act or omission committed in furtherance of the Enterprise. Specific examples of the material fraudulent misrepresentations, fraudulent concealment, and fraudulent nondisclosure of Defendants and their co-conspirators include, but are not limited to, the acts set forth in this Complaint.

63. Defendants and their co-conspirators made their fraudulent misrepresentations and omissions intending to deceive their patrons, and to induce members of the public and governmental or judicial authorities to believe that casino gambling is honest and highly regulated in such an effective way that guarantees integrity, and that casino gambling comprises games of skill and luck, and that the only risks in casino gambling are those which every patron is fully informed of and consents to by virtue of his voluntary participation in casino gambling, and to believe that the risks of casino gambling are not unreasonably or foreseeably dangerous to patrons' financial or mental health, or to society as a whole.

64. Defendants and their co-conspirators, by their lengthy record of false and misleading representations, intended to create a false controversy about casino gambling and to induce patrons and prospective patrons to gamble in casinos.

65. Defendants and their co-conspirators have intended to discourage patrons from reducing both the frequency of their casino gambling and the sums of money they wager on casino gambling, and from trying to quit casino gambling altogether. Members of the public believed in the truth and completeness of the statements made by Defendants and their co-conspirators. They relied upon the statements by Defendants and their co-conspirators,

including statements that created a false controversy about the risks of gambling, its addictiveness, severity, and rates of problem gambling, and demonstrated that reliance by engaging in casino gambling and by refraining from trying to quit or reduce their level of casino gambling. The belief in and reliance upon Defendants' and their co-conspirators' representations by members of the public was intended by Defendants and was both justifiable and reasonable.

66. As a direct and proximate result of the fraudulent misrepresentations, omissions, and concealment by Defendants and their co-conspirators, individually and collectively, members of the public began to gamble in casinos and continued doing so, until inordinate numbers of casino gamblers suffered unreasonable, excessive, and unforeseen consequences of casino gambling and continued casino gambling, and as a result, they suffered undue harm. Among other things, casino gamblers experienced immediate financial losses, permanent long-term financial damage, mental and emotional distress, loss of professional and personal relationships, and suicide.

67. The discovery phase of trial will be necessary to sufficiently and accurately detail the intricate, interlocking, and overlapping web of entities, affiliations, research groups, funding mechanisms, and repositories for gambling industry information which Defendants established, utilized, funded, and/or staffed, in order to achieve the Enterprise's goals.

68. Defendants' affirmative and intentional acts of fraudulent concealment, suppression, and denial of the facts as alleged above has continued unabated over a span of decades. Defendants have maintained a unified scheme to thwart public awareness of adverse social and scientific information concerning the risks and consequences of casino gambling by suppressing and subverting social and scientific research. Defendants have concealed the actual odds of winning casino games, concealed their manipulation of casino games' addictiveness, and denied that casino gambling is inherently addictive, while marketing casino gambling as "entertainment" and "gaming" (but not "gambling") in which outcomes are determined by "skill", all through an uninterrupted pattern of fraudulent and deceitful conduct aimed at maintaining a market for their industry and increasing profits at the expense of the patrons they endeavored to deceive.

69. The pattern of Defendants' conduct reflects an unwillingness to concede, and affirmative efforts to conceal from the public, from courts, and from regulatory bodies, pertinent and properly available information concerning the dangers of casino gambling. After a span

of decades it would be unreasonable to believe that Defendants will ever voluntarily cease their unlawful conduct, or that their pattern of racketeering activity will cease without intervention by this Court.

70. Unless restrained, Defendants will continue their attempts to keep internal information from public disclosure. They will refuse to admit, and continue to conceal, the actual risks and consequences of casino gambling, including the fact that Defendants willfully engineer and deceptively market casino gambling for the benefit of themselves and at the expense of the American public. Affirmative relief is required to ensure that Defendants fulfill their duty to disclose non-public information over which Defendants have had exclusive control, and which is crucial to the public in making informed decisions. Equitable relief is necessary to ensure an end to Defendants' continued efforts to confuse and mislead the public concerning the risks, consequences, and addictive nature of casino gambling.

71. Defendants' violations of Nevada law and RICO, and their continuing pattern of racketeering acts, will continue in connection with the affairs of the Enterprise unless this Court implements the relief requested below.

## CLAIM FOR RELIEF

WHEREAS, Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein and asserts that Defendants' conduct as described herein is in clear violation of both Nevada Revised Statute 205.377 and the federal RICO Act. To establish RICO liability, Plaintiff asserts that the evidence will prove the necessary elements of RICO itself — including the existence of an enterprise and a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c) — as well as the elements of the underlying conduct constituting the racketeering acts, i.e., numerous instances of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

THEREFORE, Plaintiff requests that this Court grant the following relief:

Pursuant to Nevada Revised Statutes, Chapter 598.0999, and the provisions of 18 U.S.C. § 1964, award damages plus appropriate interest to Plaintiff for Defendants' tortious and wrongful acts as alleged above, as follows:

1. Award Plaintiff money damages for an amount that is sufficient to repay Plaintiff for all harm including economic harm Plaintiff has suffered, including the sums he lost resultant of gambling in Defendants' casinos beginning in February of 2002 and up to and including April of 2018, totaling, with the inclusion of liquidated damages, threefold the amount of Plaintiff's actual damages;

2. Award Plaintiff the costs of this suit including any attorney fees he has incurred, together with such other and further relief as may be necessary and appropriate.

Pursuant to the provisions of 18 U.S.C. § 1964, issue an Order and Judgment, jointly and severally, against Defendants, providing the following relief:

1. Order that the Defendants who are found to have violated 18 U.S.C. § 1962, disgorge all proceeds derived from any violation of 18 U.S.C. § 1962.

2. Issue a permanent injunction that will do the following:

a. Prohibit Defendants and their agents, affiliates, servants, employees, officers, directors, owners, and all persons acting in concert with, or at the direction of, or on behalf of, Defendants, from committing any act of racketeering, as defined in 18 U.S.C. § 1961(1), and from associating directly or indirectly, with any other person known to them to be engaged in such acts of racketeering or with any person in concert or participation with them.

b. Enjoin and restrain Caesars and Paris and their agents, affiliates, servants, employees, officers, directors, owners, and all persons acting in concert with, or at the direction of, or on behalf of, Defendants, from participating in any way, directly or indirectly, in the management and/or control of any of the affairs of AGA or NCRG, or, if either AGA or NCRG has been or becomes dissolved, any successor entities of AGA or NCRG, or any other entity affiliated with AGA or NCRG, known to them to be, or have been, engaged in acts of racketeering, and from having any dealings about any matter that relates directly or indirectly to the management and/or control of AGA or NCRG, or any successor or affiliated entities known to them to be, or have been, engaged in acts of racketeering, or any successor or affiliated entities formed for substantially the same purpose as the AGA or NCRG.

c. Enjoin Defendants and their agents, affiliates, servants, employees, officers, directors, owners, and all persons acting in concert with, or at the direction of, or on behalf of, Defendants, from making false, misleading or deceptive statements or representations concerning casino gambling, or gambling in general.

d. Prohibit Defendants and their agents, affiliates, servants, employees, officers, directors, owners, and all persons acting in concert with, or at the direction of, or on behalf of, Defendants, from engaging in any public relations endeavor that misrepresents, or suppresses information concerning, the risks associated with casino gambling, and from associating with, or directing, any other persons for the purpose of engaging in such conduct.

e. Order Defendants to disclose, disseminate, and make available to such public and regulatory authorities as the Court may select, all documents relating to research previously conducted directly or indirectly by themselves and their respective agents, affiliates, servants, employees, officers, directors, owners, and all persons acting in concert with, or at the direction of, Defendants, and which relate to the risks of casino gambling or gambling in general, or to the marketing or promotion of casino gambling.

f. Order Defendants to fund, but have no part of, or influence over the control of, or decision-making power relating to, a legitimate and sustained corrective public education campaign, administered and controlled by an independent third party comprising no current or former casino industry executives, employees, owners, or investors, relating exclusively to the risks of casino gambling.

g. Order Defendants to make corrective statements regarding the risks of casino gambling, and the addictive nature of casino gambling, in all future advertising, marketing, and promotion of casino gambling.

h. Order Defendants to fund but have no part of, or influence on, or decision-making power relating to, sustained gambling cessation programs.

i. Order Defendants to fund but have no part of, or influence on, or decision-making power relating to, a sustained educational campaign for and directed toward children, with the sole purpose of deterring children from casino gambling and gambling in general.

3. Award Plaintiff the costs of this suit, including any attorney fees he has incurred, together with such other and further relief as may be necessary and appropriate to prevent and restrain further violations of 18 U.S.C. § 1962, and to end the ongoing wrongful conduct of Defendants.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all triable issues.

Respectfully submitted this 4th Day of July 2019

Eric Ehmann, Plaintiff, *pro se*

PO Box 2366

Appleton, WI 54912

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

COUNSEL/PARTIES OF RECORD

JUL 09 2019

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY_____ DEPUTY

**PRIORITY**
**★ MAIL ★**
**EXPRESS™**

OUR FASTEST SERVICE IN THE U.S.

INTERNATIONALLY,
CUSTOMS
DECLARATION
LABEL MAY BE REQUIRED.

U.S. POSTAGE PAID
PME 2-DAY
APPLETON, WI
54911
JUL 08 19
AMOUNT
**$25.50**
89101
R2304E105498-14

1007

**UNITED STATES**
**POSTAL SERVICE®** | **PRIORITY**
**MAIL**
**EXPRESS®**

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)   PHONE ( 920 ) 277 6757

ERIC EHMANN
PO BOX 2366
APPLETON WI  54912

DELIVERY OPTIONS (Customer Use Only)
☐ SIGNATURE REQUIRED
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
☐ 10:30 AM Delivery Required (additional fee, where available)

TO: (PLEASE PRINT)   PHONE( )

CLERK, US DISTRICT COURT
333 LAS VEGAS BLVD SOUTH
LAS VEGAS NV 89101

ZIP + 4® (U.S. ADDRESSEES ONLY)

8 9 1 0 1

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PAYMENT BY ACCOUNT (if applicable)
USPS® Corporate Acct. No.        Federal Agency Acct. No. or Postal Service™ Acct. No.

ORIGIN (POSTAL SERVICE USE ONLY)
☐ 1-Day   ☒ 2-Day   ☐ Military   ☐ DPO

PO ZIP Code    Scheduled Delivery Date (MM/DD/YY)   Postage
54911          7-8-19                                 $

Date Accepted (MM/DD/YY)   Scheduled Delivery Time   Insurance Fee   COD Fee
7-6-19                      ☐ 10:30 AM  ☒ 3:00 PM    $
                           ☐ 12 NOON

Time Accepted              10:30 AM Delivery Fee      Return Receipt Fee   Live Animal Transportation Fee
11:36  ☐ AM ☒ PM          $                          $                    $

Special Handling/Fragile   Sunday/Holiday Premium Fee   Total Postage & Fees
$                          $                            $   26.50

Weight    ☐ Flat Rate     Acceptance Employee Initials
2 lbs. 2 oz.

DELIVERY (POSTAL SERVICE USE ONLY)
Delivery Attempt (MM/DD/YY)   Time   ☐ AM   Employee Signature
                                     ☐ PM

Delivery Attempt (MM/DD/YY)   Time   ☐ AM   Employee Signature
                                     ☐ PM

LABEL 11-B, MARCH 2019          PSN 7690-02-000-9996

EJ 031 650 947 US

☞ PEEL FROM THIS CORNER

☟ PEEL FROM THIS CORNER

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

2013   OD: 12.5 x 9.5

0000006

