# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA
### LAS VEGAS DIVISION

ERIC EHMANN,

        Plaintiff,                              2:19 – CV – 1199

   V.

DESERT PALACE, LLC,                        JURY TRIAL DEMANDED
a Domestic Corporation,

PARIS LAS VEGAS OPERATING COMPANY, LLC,
a Domestic Corporation,

CAESARS ENTERPRISE SERVICES, LLC,
a Foreign Corporation,

CPLV MANAGER, LLC,
a Foreign Corporation,

CEOC, LLC,
a Foreign Corporation,

CAESARS ENTERTAINMENT CORPORATION,
a Foreign Corporation,

CAESARS RESORT COLLECTION, LLC,
a Foreign Corporation,

   AND

AMERICAN GAMING ASSOCIATION,
a Foreign Corporation,

        Defendants.



FILED ___ RECEIVED ___
ENTERED ___ SERVED ON ___
COUNSEL/PARTIES OF RECORD

JUL 17 2019

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

## SECOND AMENDED COMPLAINT

## INTRODUCTION

1. This is an action to recover damages resultant of fraudulent and tortious conduct of Defendants, and to restrain Defendants from engaging in fraud and other unlawful conduct in the future.

2. This action alleges violations of Nevada Revised Statutes, Chapters 205.377 and 598.0993 through 598.0999, inclusive, (COUNT ONE), and the provisions of Chapter 96 of Title 18 U.S.C. §§ 1961 through 1968, entitled Racketeer Influenced and Corrupt Organizations ("RICO"), including allegations that two casino operators and their owners, and one casino gambling industry trade organization, violated section 1962(c) and (d) of RICO (COUNT TWO).

3. This complaint alleges that Defendants violated and continued to violate RICO by joining together in a decades-long conspiracy to deceive the American public about the risks, addictiveness, and consequences of casino gambling. Specifically, Defendants have undertaken to repeatedly and consistently:

   a. purposefully work to engineer and market casino games that are as addictive as possible;

   b. conceal or deny knowledge that casino games are addictive;

   c. assert that winning at casino games is determined by "skill";

   d. conceal the odds of winning, and the casino's statistical edge in, casino games;

   e. disseminate false or misleading information about the risks and consequences of casino gambling;

   f. deny or conceal knowledge that they have, or could have, any ability to identify patrons who have a gambling dependence and/or are problem gamblers;

   g. attempt to publicly discredit studies whose findings contradicted their assertions and denials relating to these issues and, generally, the risks of casino gambling; and

   h. market or promote casino gambling to children.

4. Even though the Casino Companies have long understood the risks of casino gambling and could have developed and marketed casino gambling in ways that would have informed consumers about the facts concerning its risks, the Casino Companies chose and conspired not to do so. Instead, they have knowingly marketed casino gambling so

that the public is fraudulently enticed to participate in an activity which the Casino Companies have unlawfully manipulated and misrepresented over a course of decades in order to reap hundreds of billions, if not trillions, of dollars in unjust profits.

5. In all relevant respects, Defendants acted in concert with each other and their co-conspirators in order to further their fraudulent scheme. Beginning not later than 1994, Defendants, their various agents, employees, associates, and co-conspirators, formed an "enterprise" (the "Enterprise") as that term is defined in 18 U.S.C. § 1961(4). The Enterprise has functioned as an organized association-in-fact for at least the last 25 years to achieve, through illegal means, the shared goals of maximizing casino gambling profits and avoiding the consequences of their actions. Each Defendant has participated in the operation and management of the Enterprise and has committed numerous acts to maintain and expand the Enterprise.

6. In order to conceal their fraudulent conduct and avert detection, Defendants have engaged in a scheme to make false and deceptive statements to the public and governmental or judicial authorities, while concealing information and research that they knew would have exposed their public campaign of deceit.

7. The majority of casino gamblers do not gamble for excitement, or thrill, or entertainment. They gamble because they believe they have a fair shot at winning; they gamble to make money. They believe that if their skills are good enough, they can beat the casino. They believe this, because they don't know what the actual odds of winning really are, or that the casino has a statistically insurmountable mathematical edge that no bankroll is ever big enough to overcome. They believe this, because it is exactly what the Defendants work so hard to make them believe. Because Defendants know that if they didn't believe it, they wouldn't continue gambling– gambling away their money, their relationships, their lives. Which they do because they have been fraudulently enticed and manipulated into a downward spiral they can't get out of, unless and until some catastrophe befalls them as a result of the lengths they go to, to support their gambling. To support the Defendants.

8. Defendants' unlawful conduct has caused unquantifiable injury to, and wreaked immeasurable adverse consequences on, consumers and the public. Americans, including Plaintiff, who have engaged in casino gambling at any time in at least the last 25 years have suffered a host of injuries ranging from immediate and long-term economic harm to emotional pain and suffering, mental health disorders, and in some cases suicide. The

effect of Defendants' fraudulent activities and unlawful scheme continues to this day, and unless they are held to account by this Court, Defendants are likely to continue their conduct in the future.

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 18 U.S.C. §§ 1964(a) and (c), because (in part) this Complaint alleges violations of 18 U.S.C. §§ 1341, 1343, and 1961 through 1968, and is brought pursuant to 29 U.S.C. § 216(b).

10. Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants reside in and have principle places of business in this District, and because the events giving rise to the claims in this Complaint occurred predominantly in this District.

## I.   PARTIES

11. Plaintiff, ERIC EHMANN, ("Mr. Ehmann"), is an adult resident of Appleton, Wisconsin.

## A. CASINO OPERATING COMPANY DEFENDANTS

12. Defendant, DESERT PALACE, LLC, doing business as Caesars Palace, ("Caesars Palace"), is a Nevada company with a principal place of business at 3570 South Las Vegas Boulevard, Las Vegas, NV 89109. At relevant times, Caesars Palace and its owners or parents have engaged in the business of casino gambling and/or other forms of wagering at numerous properties throughout the United Sates, including in Las Vegas. At all relevant times, Caesars Palace, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

13. Caesars Palace's registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

14. Defendant, PARIS LAS VEGAS OPERATING COMPANY, LLC, ("Paris"), is a Nevada company with a principal place of business at 3655 South Las Vegas Boulevard, Las Vegas, NV 89109. At all relevant times Paris has engaged in the business of casino gambling in Las Vegas, and has, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

15. Paris' registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

## B. <u>PARENT COMPANY DEFENDANTS</u>

16. Defendant, CAESARS ENTERPRISE SERVICES, LLC, ("CES"), is a Delaware company with a principal place of business at 1 Caesars Palace Drive, Las Vegas NV 89109. Desert Palace, LLC, and Paris Las Vegas Operating Company, LLC are "Key Employees" of CES. At all relevant times, CES, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

17. CES' registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

18. Defendant, CPLV MANAGER, LLC, ("CPLV"), is a Delaware company with a principal place of business at 1 Caesars Palace Drive, Las Vegas NV 89109. CPLV is a "Key Employee" of Desert Palace, LLC. At all relevant times, CPLV, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including

the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

19. CPLV's registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

20. Defendant, CEOC, LLC, ("CEOC"), is a Delaware company with a principal place of business at 1 Caesars Palace Drive, Las Vegas NV 89109. CEOC owns CPLV Manager, LLC, and co-owns Caesars Enterprise Services, LLC. At all relevant times, CEOC, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

21. CEOC's registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

22. Defendant, CAESARS ENTERTAINMENT CORPORATION, ("CEC"), is a Delaware company with a principal place of business at 1 Caesars Palace Drive, Las Vegas NV 89109. CEC owns CEOC, LLC. At all relevant times, CEC, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

23. CEC's registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

24. Defendant, CAESARS RESORT COLLECTION, LLC, ("CRC"), is a Delaware company with a principal place of business at 1 Caesars Palace Drive, Las Vegas NV 89109. CRC is a co-owner of Caesars Enterprise Services, LLC. At all relevant times, CRC, individually or through its agents, alter egos, subsidiaries, divisions, employees, owners, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and/or otherwise aided and abetted one or more co-conspirators, including the other Defendants, in the unlawful, misleading, and

fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

25. CRC's registered agent for service of process in the state of Nevada is Corporation Service Company, 112 North Curry Street, Carson City, Nevada 89703

26. Desert Palace, LLC, Caesars Palace, Paris Las Vegas Operating Company, LLC, Paris Las Vegas, Caesars Enterprise Services, LLC, CPLV Manager, LLC, CEOC, LLC, Caesars Entertainment Corporation, and Caesars Resort Collection, LLC, are referred to herein collectively as the "Casino Companies".

## C.  CASINO INDUSTRY TRADE COMPANY DEFENDANT

27. Defendant AMERICAN GAMING ASSOCIATION ("AGA"), is a Washington, DC, non-profit corporation whose registered agent for service of process in the state of Nevada is Lavonne Withey, 4012 Dustin Avenue, Las Vegas, Nevada 89120.

28. AGA is not primarily a "research" organization but was established by a coalition of casino operators, casino industry executives, and casino employees or agents, including Caesars Palace and/or its agents, officers, owner(s), parent(s), and/or affiliates, to carry out its fraudulent course of conduct, beginning in 1994. At all relevant times, AGA operated as public relations and lobbying arms of the Defendants and their co-conspirators, and as agents and employees of same. It also acted as a facilitating agency and co-conspirator in furtherance of the conspiracy as described in this Complaint. In acting as alleged herein, AGA acted within the course and scope of its agency and employment, and with the knowledge, consent, permission, and authorization of the other Defendants and their co-conspirators. All actions of AGA were ratified or approved by various agents, officers, or representatives of the other Defendants or their co-conspirators. At times pertinent to this Complaint, AGA, individually and through its agents, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other Defendants and/or their co-conspirators in the unlawful, misleading, and fraudulent conduct alleged herein, and have affected interstate commerce in the United States.

29. Desert Palace, LLC, Caesars Palace, Caesars Enterprise Services, LLC, CPLV Manager, LLC, CEOC, LLC, Caesars Entertainment Corporation, Paris Las Vegas Operating Company, LLC, Paris Las Vegas, Caesars Resort Collection, LLC, and AGA are referred to herein collectively as the "Defendants".

30. At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. §1961(3), because each Defendant was "capable of holding a legal or beneficial interest in property."

## BACKGROUND

31. Casino gambling is one of the most popular past times in American culture. The United States has more than 1,000 casinos across 40 states, which attract millions of gamblers and generate billions of dollars in profits for casinos, each year.

32. Studies have shown that up to 10 percent of the adult population of the United States are problem gamblers, while up to half of them are clinically pathological – numbers far exceeding the number of U.S. adults who have serious alcohol problems – and that problem gamblers account for a significant majority of the gambling revenue of U.S. casinos. Plaintiff asserts that the evidence uncovered in this action will show that a majority of U.S. casino gamblers are problem gamblers.

33. Mr. Ehmann began gambling at Las Vegas casinos operated by Caesars Palace and Paris in April of 2002, and continued doing so intermittently up until April of 2018. Mr. Ehmann played the table game, blackjack, and slot machines almost exclusively, on occasion playing other games as well. Mr. Ehmann believed at all relevant times that by employing the correct strategy and bankroll management, and by making the correct gameplay decisions, he could consistently win money at casino games. At all relevant times, Mr. Ehmann was unaware of both the actual odds of winning, and the statistical edge of the casino. Over the course of thousands of hours, Mr. Ehmann has lost more than one million dollars gambling. Prior to becoming a casino gambler, Mr. Ehmann had never before broken the law, or even considered doing so, until he became so desperate after losing all of his money at the blackjack tables that he feared his girlfriend would break up with him and he would become homeless, which led him to begin committing various financial crimes in order to fund his casino gambling in an attempt to win back

not just money he had already lost but money he began to steal. Mr. Ehmann spent five years in federal prison for his crimes, but he has since made full restitution including interest. Mr. Ehmann last played blackjack and slot machines at Caesars Palace in Las Vegas on April 21, 2018.

## II.    GENERAL ALLEGATIONS
### A. CASINO COMPANIES' BUSINESS PRACTICES

34. The Casino Companies are in the business of casino gambling, and as such represent to consumers and the public that casino gambling is honest and of integrity, subject to stringent and effective governmental regulation.

35. The Casino Companies do not disclose any of the odds of winning casino games, whether table games or electronic gambling machines (e.g., slot machines), nor do they disclose the fact that they have a statistically insurmountable mathematical edge in all casino games.

36. The Casino Companies advertise casino gambling as comprising games of "skill" or "chance", despite their knowledge that they have a statistically insurmountable mathematical advantage which no amount of skill or chance can overcome.

37. The casino games offered by the Casino Companies, including particularly electronic gambling machines such as slot machines and video poker machines, are intentionally engineered, to their knowledge and at their direction and/or with their assistance, to be as addictive as possible, exploiting psychological and physiological vulnerabilities in order to facilitate and prolong compulsive behavior, conditioning and enticing patrons, including Mr. Ehmann, to gamble, and continue gambling, even (and especially) when consistently losing.

38. The multitudinous brightly lit, blinking, flashing, chiming electronic gambling machines which are prominently featured throughout the Casino Companies' casinos frequently and regularly promote enormously large jackpots which, in fact, patrons rarely, or never, actually win, while the actual odds of winning are never disclosed.

39. In about the early 1980s, with the advent of computer technology resulting in the development of new types of computerized slot machines, the odds of winning the

jackpot on a typical slot machine went from approximately 1 in 11,000 to 1 in 137,000,000, an order of magnitude effectively on par with the odds of winning an interstate mega lotto jackpot.

40. Today's slot and video poker machines are capable of being connected via computer networks that allow different casinos in different locations, including in different states, to pool proceeds from networked machines in order to advertise substantially larger than usual jackpots to consumers across state lines. Beginning no later than 2014, Caesars Palace and its affiliates offered at least one such networked slot machine to patrons in both Nevada and New Jersey.

41. The Casino Companies advertise very high and unrealistic "payback rates" of their slot machines, which tend to be around 95%, give or take. However, slot machine payback rates are inherently misleading and deceptive, and intentionally so. The advertised payback rates are theoretical and based on long-term play, and in no way guarantee that the real-world result will ever equate to the advertised payback rate. This is because of the way the machine is engineered (with respect to the odds of winning) and the fact that no gambler has a large enough bankroll to sustain a sufficiently long session of play to guarantee that his own payback rate will match (or even come close to) the advertised rate. However, slot machine players, including Mr. Ehmann, believe and have believed that, essentially, if slot machines are advertised as having, for example, a 95% payback rate, that means that one can reasonably expect to only lose, on average, about 5% of the money he wagers.

42. Despite having knowledge of these facts, the Casino Companies willfully and deceptively advertise such fraudulent assertions as, "Caesars Palace is the Las Vegas casino that has been the site of more $1,000,000+ jackpots than any other casino in the world. You could be the next winner!", which it disseminates or causes to be disseminated over the wires via its website.

43. In fact, as described in an online article about gambling technology (i.e., slot machine) companies, entitled "The Progressive State", published in Global Gaming Business Magazine and dated June 18, 2019: "The dream of a life-changing score fuels an entire industry sector. [Because] the increased number of [linked] machines reduces the odds of

hitting [a jackpot,] gaming's big suppliers provide the vehicles for the attempt. Their products are increasingly imaginative."

44. In fact, there are a number of gambling technology company executives who sit on the board of Defendant AGA, including Trevor Croker, CEO & managing director of Aristocrat Technologies; Mike Rumbolz, president & CEO of Everi; and Steve Sutherland, president & CEO of Konami Gaming, all of whose company representatives have been recently quoted in articles in Global Gaming Business Magazine, and all of whom engineer and manufacture electronic gambling machines marketed by the Casino Companies.

45. In the above-referenced article of June 18, 2019, Jon Hanlin, the vice president of commercial strategy in gaming operations for Aristocrat Technologies, is quoted as stating, in regard to one of its recent and highly successful slot machines, Lightning Link: "it's a way, through entertainment and gambling, of enabling players to feel that the more they bet, the better their chances are for big return...As you walk up to the bank of four [machines], every minute somebody is in that hold-and-spin bonus situation. It drives that excitement and winning environment."

46. These banks of networked machines, with their ever-changing "grand jackpot banner[s]" dazzlingly displayed atop them, are intended, according to the article, to have the "reinforced effect of someone seeing another player hit or returning after a couple hours to see the bonus amount has changed, indicating there'd been a winner", thereby enticing players to wager on the machines.

47. In the same article, Steve Walther, Konami's senior director of marketing and product management, states: "When we were looking at the financial crisis a few years ago, we were interested in helping people extend time on device with bonuses that looked achievable".

48. Jesse DeBruin, the senior vice president of gaming operations for Everi, admits in the same article that Everi promotes larger and more-attainable jackpots than those which patrons can actually win: "For the player, frequently hitting jackpots of various sizes are attractive...Multiple games that feed up to ever-increasing meters make it more believable and realistically attainable for the player—as if they're working towards recognizable jackpot pattern hit levels.

49. Additionally, Everi admits that it has the player tracking technology which the Casino Companies could use, if they so chose, to identify and reduce rates of problem gamblers, however Everi states that its primary purpose for collecting and analyzing this data is expansion of casino profits. In the article "Data Crazy", published online in Global Gaming Business Magazine dated May 28, 2019, Jesse DeBruin of Everi states: "Everi uses analytics software to evaluate the performance of a cross-section of its lease footprint made up of approximately 14,000 games, inclusive of both original content and licensed brand themes...This data enables team gaming operations to track and predict revenue... and...identify relevant trends in game performance and run analyses that support everything from design decisions to deployment of new and existing titles and player mechanics...Everi collects and analyzes data from the more than 840 casinos that are connected to its secure network...We evaluate transaction data from our ATMs and self-service kiosks... [Improvements] in tooling and reporting has given both operators and manufacturers earlier and better access to performance data to facilitate better decision making." That is to say, better and more effective ways of executing their fraudulent scheme of deception.

50. For at least the last 25 years, Defendants or their agents, associates, and co-conspirators have conducted extensive research into the psychology and physiology of gamblers, including specifically the emotional and physical responses gamblers experience when winning and losing, along with the effect the casino environment itself has on gamblers, as well as the effectiveness of "perks", promotions, and "complimentaries" (or "comps") that consumers, including Mr. Ehmann, receive, all of which is analyzed and leveraged by the Casino Companies to maximize the sums wagered (i.e., lost) by consumers, and the frequency and duration consumers gamble, even (and especially) when losing. The Casino Companies secretly engage in these tactics without ever disclosing the odds of winning.

51. In furtherance of their scheme, Casino Companies purchase from direct advertising companies mailing lists for the purpose of marketing directly to problem gamblers. These mailing lists include the infamous "Compulsive Gamblers Special," a mailing list of 200,000 names and addresses of people with "unquenchable appetites for all forms of gambling." On information and belief, Caesars Palace has purchased the "Compulsive

Gamblers Special" and used it target problem gamblers.

## B. FORMATION AND TACTICS OF THE ENTERPRISE

52. Beginning in about the early 1990s, as public and legal scrutiny of American cigarette manufacturers intensified as a result of decades of gradually increasing public awareness of the health risks of smoking and increasing questions about cigarette companies' knowledge and denial of those risks, and their potential liability, casino operators realized that the changing social and legal climates in the United States could lead to scrutiny of their own conduct and eventually pose an existential threat to their business model, so a coalition of casino industry executives, owners, and investors undertook a series of meetings for the purpose of developing a preemptive strategy to de-legitimize any such scrutiny and neuter any potential existential threat.

53. Toward that end, co-conspirators including Caesars Palace and its affiliates, owners, and others, formed the American Gaming Association in 1994. The AGA presently describes itself on its website as: "Dynamic. Thriving. Responsible. We are the united casino gaming industry. Accomplishing greater innovation and growth together." It goes on to state the following: "The adrenaline of chance. The excitement of winning. The assurance of Integrity. Effective consumer protections enable our patrons to confidently enjoy responsible entertainment experiences. Gaming companies invest over $300 million annually in responsible gaming programs, and a deeply rooted culture of compliance ensures our industry upholds the highest standards of fairness and transparency."

54. Presently, the AGA's board of directors is described on its website as "Leaders from across the industry who convene regularly to discuss a wide range of issues affecting the current and future state of casino gambling", and includes Christian Stuart, identified as the EVP of Gaming & Interactive Entertainment for Defendant CEC, and John Payne, identified as the President and COO of VICI Properties (an affiliate or owner of the Casino Companies).

55. The Casino Companies and others have acted through the AGA to pay lip service to promoting "responsible gaming" by means of policies, research initiatives, and statements that, on the surface, may appear to demonstrate a sincere effort to stem the

prevalence of problem gambling but which in fact ring hollow, such as by the AGA's 2017 announcement of a new "code of conduct" aimed at "consumer protection" which, while generating positive news coverage favorable to their reputation, in fact didn't amount to a comprehensive strategy with any verifiable effect. Similarly, the National Center for Responsible Gaming (the putative research arm of AGA, formed in about 1996), offers a pamphlet on its website, entitled "Talking with Children About Gambling", which on the surface may seem like a good-faith effort but which in substance falls far short of addressing the actual risks and realities of gambling, including by neglecting to address the officially-licensed gambling-simulation video game software bearing the Caesars Palace brand, which is marketed to children at the direction and with the knowledge of the Casino Companies.

56. Defendants and their co-conspirators are fully aware that gambling addiction is stronger than mere habit formation, and that the majority of problem gamblers wish that they did not gamble. Despite this knowledge, Defendants have made numerous statements trivializing and outright denying both the dependence casino gambling causes, as well as their responsibility and ability to recognize it or, much less, enact policies and practices designed to effectively reduce the level of profits they reap from problem gamblers.

57. In a 2013 article in the Wall Street Journal, Caesars Palace's CEO Gary Loveman stated, "I think it's a terrible idea" to engage in any effort to identify problem gamblers, further adding, "Is it McDonald's obligation to decide you have a problem because you have a tendency to eat high-calorie lunches? You could take this to ridiculous extremes." Caesars Palace's spokesperson Jan Jones Blackhurst was also quoted in the same article as stating that the idea that casinos could, or should, identify problem gamblers was "hogwash". Geoff Freeman, president of the AGA, is quoted elsewhere as stating, "There is a set standard to determine [alcohol] inebriation. Nothing of that sort exists to measure what the level is to have gambled too much."

58. However, not only does the American Psychiatric Association in its current, publicly available, Diagnostic and Statistical Manual-V, ("DSM-V"), establish specific factors constituting gambling disorders (i.e., problem gambling), but the Casino Companies themselves facilitate at least half the criteria necessary for such a diagnosis merely by extending casino credit to patrons who have just lost money gambling in their casinos.

According to John W. Kindt of the University of Illinois, writing for the Mercer Law Review, "any gambling facility granting credit (particularly over $200) to a [gambler] has actual or constructive knowledge that the gambler is problematic." On information and belief, the Casino Companies extend casino credit in amounts over $200 to numerous patrons on a daily and ongoing basis. Presently, the Casino Companies' websites contain the following solicitation: "Casino credit gives you the ability to obtain funds from your checking account without the need to carry cash", which itself demonstrates a consciousness of guilt by its intentional mischaracterization of the true reason, known to the Casino Companies, that they offer "casino credit", which is not for convenience of its patrons but rather to facilitate their scheme to entice and defraud them.

59. The long-articulated position of the Casino Companies and their co-conspirators is that the blame for adverse consequences of casino gambling lies solely with individual gamblers, and it turns out that the industry-funded studies undertaken or sponsored by AGA and/or NCRG and/or recipients of their funding overwhelmingly favor the Casino Companies and their co-conspirators in affirming that position, while ignoring or neglecting to study the actual effects casino gambling has on individuals and communities. In fact, NCRG's research has focused almost exclusively on peripherally-related or ancillary issues, such as neurobiology, genetics, relapse rates, brain imaging, and drug treatment, while ignoring urgent social issues critical to setting public policy, such as gambling's role in, and effect on, bankruptcy, divorce, crime, and suicide, or its overall effect on communities in which casinos operate.

60. Presently on the AGA website is a page entitled, "U.S. Casino Gaming's Local Economic Impacts", under which it states, "Our research brings forward data and expert perspectives to educate elected officials, community leaders, and the public at large about casino gaming's positive economic impact." On another page in the "Research" section of the website it states, "The gaming industry remains a powerful economic engine and a dynamic job creator." The site prominently features a "Fact Sheet", dated February 13, 2019, entitled, "Responsibility in Gaming Survey", which asserts that "90 Percent of Casino Visitors Practice Responsible Gaming", before listing incredible findings that 90% of all casino gamblers essentially engage in nothing but responsible casino gambling in all conceivable ways. As Joanna Franklin of the National Council on Problem

Gambling is quoted as saying in reference to the NCRG, "They're not going to fund anything that's going to hurt them, or that has the potential to hurt them." Plaintiff asserts that the evidence will show that the Casino Companies' own internal data proves that a majority of casino gamblers are known to them to be problem gamblers; a far cry from the assertion that 90% of casino gamblers are "responsible".

61. In stark contrast to statements from members of the Enterprise – legitimate, peer-reviewed scientific studies (that were not funded or undertaken by members of the Enterprise) have identified causal links between the way casino games are (purposefully) engineered and both the rates of problem gambling and the severity of its adverse consequences. Such studies consistently conclude that it is possible to both minimize the creation of problem gamblers as well as to identify them, in part because the Casino Companies are already equipped with the means to do so by way of the player-tracking systems they have in place and which they use to dole out comps for the purpose of encouraging and maximizing patrons' gambling (i.e., losses).

62. After a study by the University of California at San Diego identified higher rates of suicide in Las Vegas as compared to comparable American cities which don't have casino gambling, AGA's founding president, Frank Fahrenkopf, commissioned research to discredit that study. After a study by the University at Buffalo's Research Institute on Addictions concluded that the rate of problem gamblers in the United States is twice that of alcoholics, members of the Enterprise publicly discredited the findings.

## C. DEFENDANTS' PARTICIPATION IN THE ENTERPRISE

63. The decisions made by members of the Enterprise and its co-conspirators, including casino executives, agents, affiliates, owners, parents, and investors, beginning no later than with the creation of the AGA in 1994, have shaped the actions of the casino industry to this day, and both the Enterprise and the unlawful conspiracy that was created, and of which Defendants are a part, still continues.

64. The fundamental goal of the Enterprise and its conspiracy was and is to preserve and expand the market for casino gambling, and to maximize the Casino Companies' profits.

To achieve these goals, the Enterprise's strategy was several-fold and includes agreements among its members to:

    a.  conceal the actual odds of winning;

    b.  conceal the casino's mathematically insurmountable statistical edge;

    c.  refrain from advertising one casino's "house rules" (i.e., the rules of the games) as more favorable than those of other casinos;

    d.  share player data with each other for the purpose of engineering the most-addictive product possible;

    e.  use the word "gaming" as a more-attractive and less controversial or risky-sounding alternative to the word "gambling";

    f.  respond to scientific evidence of the risks and consequences of casino gambling with fraud and deception; and

    g.  focus their promotions and advertisements on glamor, luxury, and entertainment aspects of casino properties, while minimizing or concealing the true profit-driver of casino business – gambling – and its risks and consequences, in the same way tobacco companies marketed their dangerous products because, like tobacco companies, casinos recognize the need to provide a psychological crutch and self-rationale for gamblers to continue gambling.

## D. <u>RACKETEERING ACTS OF DEFENDANTS</u>

65. Plaintiff reasserts and incorporates by reference the allegations and facts set forth above as if fully set forth herein.

66. For a period of decades up until about early 2019, Caesars Palace published and distributed through United States Postal Service mail its own magazine, entitled either "Vegas Player", or "Caesars Player", which it used as an instrument for fraudulently deceptive and misleading marketing and promotion, and which Mr. Ehmann read on numerous occasions at relevant times.

67. For a period of decades beginning no later than about the late 1990s, Caesars Palace published, or caused to be published, a variety of print advertisements in various magazines, which it intended, and knew to be, distributed through United States Postal

Service mail, and which it used as an instrument for fraudulently deceptive and misleading marketing and promotion, which Mr. Ehmann viewed on numerous occasions at relevant times.

68. For a period of years beginning no later than about 2010 and up until today, Caesars Palace established or caused to be established its own content channel on youtube.com, through which it published or caused to be published numerous video advertisements which it intended, and knew to be, broadcast over wires via the internet, which it used as an instrument for fraudulently deceptive and misleading marketing and promotion, and which Mr. Ehmann viewed on numerous occasions at relevant times.

69. For a period of years up until today, the Casino Companies have established and maintained websites, which they published or caused to be published and which they intended, and knew, to be accessible over wires via the internet, and which were used as instruments for fraudulently deceptive and misleading marketing and promotion, which Mr. Ehmann viewed on numerous occasions at relevant times.

70. As part of its fraudulent scheme and in furtherance of the Enterprise, the Caesars Palace website presently contains the following misleading and deceptive statements:

    a. Caesars Palace table games "test your luck and skill".

    b. At Caesars Palace, "the excitement rises as you face off with lady luck and test your skill with games of chance such as Blackjack, Craps, Roulette, Baccarat…"

    c. "While Blackjack is basically a simple game, its strategy can be complex and often reflects each player's personality."

71. As part of its fraudulent scheme and in furtherance of the Enterprise, the Paris website presently contains the following misleading and deceptive statement:

    a. "Showcase your skills on your favorite games at Caesars Entertainment casinos in Las Vegas. Take your best shot at slots, table games and the latest interactive and skill-based games."

72. As part of their fraudulent scheme and in furtherance of the Enterprise, the Casino Companies have undertaken to intentionally focus their advertising on promoting glamor, luxury, and entertainment aspects of casinos. These efforts demonstrate a consciousness of guilt on the part of Casino Companies, because they know that not only does the majority of their gambling revenue come from problem gamblers but, on information and

belief, the majority of their overall profits come from gambling, despite Casino Companies' public statements to the contrary.

73. As part of its fraudulent scheme and in furtherance of the Enterprise, beginning not later than about April of 2002, Caesars Palace has produced, or caused to be produced, and disseminated, or caused to be disseminated, through the mail, a series of advertisements enticing the public to "[r]elive the legend", "[r]ub shoulders with the gods", and "experience the most opulent, most indulgent civilization ever created" while claiming that "[p]eople have a tendency to get upset when they have to leave [Caesars Palace]."

74. As part of its fraudulent scheme and in furtherance of the Enterprise, the Caesars Palace website presently contains the following statements:

   a. "Enjoy your lavish surroundings while playing your favorite slots and table games – including blackjack and poker – or take your chances at the race and sports book. Whether you're looking to win big or simply in it for the experience, Caesars Place [sic] always offers something fun to play."

   b. "When players at a Craps table in a Las Vegas casino win big, the whole casino knows it. You'll hear the cheers erupt and see strangers high five when the dice are hot…Learn the very basics of the game and after a few minutes, even novice players begin to appreciate the unparalleled excitement of the Craps tables."

   c. "[Roulette is] perhaps the most popular game in the world…especially in Europe, where it is the best-loved of all Las Vegas casino games…Choose your lucky numbers…the possibilities are endless and the payouts can be large."

   d. "[Baccarat is] James Bond's casino table game of choice…Easy to learn, fun to play and the ultimate in sophistication."

75. As part of its fraudulent scheme and in furtherance of the Enterprise, the Paris website presently contains the following statement: "There's nothing like strolling up to a Las Vegas table game with a lover on your arm and trying your luck with the dice or cards. For high rollers, our Salon des Tables right off the main casino floor offers high limit excitement."

76. For a period of years beginning no later than about 1991 and continuing up until today, the Casino Companies and their co-conspirators have intentionally and deceptively marketed casino gambling to children throughout the United States by means of the wires

and mail, and in so doing have affected interstate commerce. Caesars Palace's efforts began no later than about 1991, with the release of a series of several officially-licensed Caesars Palace-branded gambling simulation video game software products for use with a variety of video game consoles including the Nintendo Entertainment System and Sega Genesis, among others. These gambling simulators were released and sold throughout a period of several years and came with either no age recommendation or, if they did, the recommendation was that they were appropriate for "kids to adults", and as such were marketed to children including by advertisements in video game-related magazines that Caesars Palace caused and/or knew to be distributed through the mail. Beginning no later than about 2011, the Caesars Palace brand has been licensed to, or is used with permission by, software development company, Playtika (which, beginning no later than about 2011, was owned by Caesars Palace or one of its divisions, affiliates, or parents), which develops and markets a range of video gambling "apps" that are marketed and distributed over wires via the internet. The recommended age for these gambling simulations, which is displayed on the software download page, is 12 years and up. These gambling simulators are designed to promote casino gambling among, and are marketed directly to, children, including to Mr. Ehmann, who first saw an advertisement for the Super Nintendo Entertainment System video game, "Super Caesars Palace", published in a video game magazine he subscribed to, in about 1993, causing him to rent the game from his local video game rental store. Mr. Ehmann was 13 years old at the time.

77. Rather than provide full disclosure to the public and in governmental or judicial proceedings about what they knew about the risks and consequences of casino gambling, Defendants and their co-conspirators determined, in furtherance of their Enterprise and conspiracy, to deny or minimize the risks and consequences of casino gambling and to maintain such positions that, for example, casino gambling is akin to eating Big Macs, despite having knowledge of not only the inherent addictiveness of casino gambling, its prevalence, and the portion of the Casino Companies' gambling revenues that come from problem gamblers, but also of the Casino Companies' own efforts to manipulate the development and marketing of casino gambling in deceptive ways that exploit the psychological and physiological vulnerabilities of patrons, including Mr. Ehmann.

78. Defendants and their co-conspirators sought to ensure that no casino company broke ranks from their public posture, which was based on falsehood and deception. If any casino company acknowledged the true risks and consequences of casino gambling, or admitted that they intentionally marketed casino gambling in fraudulent ways to maximize profits, or admitted the prevalence and preventability of problem gambling, and the fact that problem gamblers could be identified and their numbers effectively reduced, or acknowledged a causal relationship between casino gambling and the rates and severity of problem gambling, or admitted that the addictiveness of casino gambling is significantly exacerbated by Defendants' intentional efforts, or that Defendants' research commitment was a sham, the conspiracy would be endangered.

79. To further protect the Enterprise, their conspiracy, and their profits, Defendants made false and misleading statements to the public and in governmental or judicial proceedings, whether through press releases, advertising, or statements, which they did over wires and by use of the mail, and in doing so adhered to their common scheme of deception and falsehood including by, among other things, concealing information which they knew to contradict their statements.

### III.   GENERAL LIABILITY FOR FRAUD AND NEGLIGENCE

80. Defendants and/or their agents, employees, representatives, officers, and affiliates design, engineer, market, promote, and engage in what can be described as a product – casino gambling – which, when engaged with by consumers in the manner intended by Defendants, causes an inordinately large percentage of consumers, including Mr. Ehmann, to become addicted and/or to sustain unreasonable, excessive, and unforeseeable injuries.

81. The true nature of the risks and consequences of casino gambling are beyond that reasonably contemplated by the ordinary consumer and, in particular, beyond that contemplated by the ordinary first-time consumer who has not yet formed a dependence on casino gambling. Moreover, the true risks of Defendants' products, as designed, engineered, and marketed, are not open or obvious to consumers, including Mr. Ehmann.

82. Because Defendants have had available to them means to reduce the risks and consequences of casino gambling, as well as the prevalence of problem gamblers and the adverse consequences of problem gambling, but chose not to develop or effectively implement those

means, the extreme risks of the design of casino games substantially outweighs the utility of their design. Defendants have failed to use reasonable care and honestly assess and acknowledge the risks of casino gambling in order to market their product with actual integrity by informing consumers of the odds of winning, among other things set forth herein.

## IV.    BREACH OF ASSUMED DUTIES

83. Defendants, along with their co-conspirators, deliberately and voluntarily made statements to the public and to governmental or judicial authorities, agencies, public officials, and others who advance and protect the public interest, by which they made the following undertakings:

  (a) to accept an interest in the public's well-being and responsible use of their product as a basic and paramount responsibility;

  (b) to cooperate closely with those who safeguard the public well-being in these regards;

  (c) to aid and assist the research effort into all aspects of casino gambling and its risks;

  (d) to continue research and all possible efforts until all the facts are known; and

  (e) to provide complete and authenticated information about the risks of casino gambling and its consequences for consumers and society.

84. Defendants, therefore, have assumed and affirmatively acknowledged a duty to disclose to governmental agencies, the public, and consumers material facts about the risks of casino gambling, including material facts about the odds of winning and the causes and prevalence of problem gambling, but instead they have concealed their manipulation of information relating to those matters, and concealed the facts concerning their fraudulent development, marketing, and promotion of casino gambling.

85. Defendants' statements were made to reassure the public of the honesty and integrity of their product, while their commitment was to ensure that their product was marketed as responsibly as possible while minimizing to the fullest reasonable and practicable extent the adverse consequences of their product. In fact, however, Defendants had no intention of determining or disclosing the actual risks of their product, advising consumers or the public of those risks, or ensuring that their product was marketed in the most-responsible and honest way. Defendants, acting in concert, used their promises to gain credibility for their false and misleading statements, and intended to create a false controversy about the risks and consequences of casino gambling.

86. Defendants intended that consumers, the public, and governmental or judicial officials would rely upon them to fulfill their publicly stated commitment, and they recognized or should have recognized that truly independent research and full disclosure, consistent with their publicly stated commitment, was necessary to protect consumers. Defendants realized that their conduct would affect the gambling choices and behavior of millions of Americans, including Mr. Ehmann.

87. Defendants have failed to exercise reasonable care in the performance of their undertaking. Rather than engaging in, or funding, earnest, good faith, and/or comprehensive research to understand the actual risks and consequences of casino gambling, Defendants along with their co-conspirators deliberately designed and funded a putative research program so as to avoid determining the full scope of the dangers posed by their product, and acted to suppress or even terminate research that threatened to expose the risks and addictiveness of casino gambling. Through their failure and suppression, they have breached and continue to breach their assumed duties. Defendants' failure to exercise reasonable care has increased, and continues to increase, the risk of injury to consumers and collateral injury to the public.

88. Defendants and their co-conspirators have made false promises to conduct and disclose objective research on the issue of so-called "responsible gaming", but they have fraudulently concealed information relating to the risks of casino gambling and its detrimental effects on individuals and society, including the actual odds of winning and the fact that casino games are intentionally engineered to be addictive.

89. Defendants have failed to promote or be guided by the American Psychological Association's definition of addiction, as described in DSM-V, and further refuse to admit that casino gambling itself creates and sustains addiction, or that the reason consumers develop gambling addiction is not a failure of will power but precisely because of the addictive nature of gambling in conjunction with Defendants' deceptions concerning casino gambling and, especially, the addictive nature of casino gambling resultant of Defendants' efforts to engineer and manipulate the marketing and promotion of casino gambling for the purpose of maximizing its addictiveness and profitability.

90. Defendants' breach of their duties and willful misconduct was done in reckless and wanton disregard of the risks to consumers, and with actual or constructive knowledge of the fact that their misrepresentations and deceit would cause serious injuries to large numbers of consumers, including Mr. Ehmann.

## COUNT ONE

### Liability Under Nevada Revised Statutes 205.377 and 598.0903 to 598.0999, Inclusive.

91. Plaintiff reasserts and incorporates by reference the allegations and facts set forth above as if fully set forth herein.

92. Nevada Revised Statute 205.377 states that a "person shall not, in the course of an enterprise or occupation, knowingly and with the intent to defraud, engage in an act, practice or course of business or employ a device, scheme or artifice which operates or would operate as a fraud or deceit upon a person by means of a false representation or omission of a material fact that: (a) The person knows to be false or omitted; (b) The person intends another to rely on; and (c) Results in a loss to any person who relied on the false representation or omission, in at least two transactions that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents within 4 years and in which the aggregate loss or intended loss is more than $650…A violation of this section constitutes a deceptive trade practice for the purposes of NRS 598.0903 to 598.0999, inclusive."

93. Defendants and their agents, employees, officers, representatives, and affiliates have made affirmative material misrepresentations, have omitted material facts, and have concealed material information concerning the risks associated with casino gambling, particularly with respect to the actual odds of winning. They have made false and misleading statements and concealed material information concerning the prevalence of problem gambling and their own ability to either recognize, or mitigate the prevalence of, problem gamblers, from whom they earn a majority of their gambling profits. At the time that these false or misleading statements and representations were made, Defendants and their co-conspirators knew or should have known that their statements were materially fraudulent, false, or misleading, and that they intentionally omitted or concealed material information. Additionally, or in the alternative, Defendants and their co-conspirators made the statements recklessly and with willful disregard for the accuracy or truthfulness of their representations.

94. Defendants' statements and omissions as described herein concern material information because consumers, including Mr. Ehmann, when deciding whether to gamble, must resolve initial reservations (or lingering qualms) about their chances of winning, the potential for monetary loss, the risk of addiction, and the risk of consequences that might affect their

finances, their livelihood, their family, their friends, and others. Defendants' prevarications, misleading and/or false statements, and concealment concerning each of these issues suggests full awareness of the obvious fact that reasonable consumers interested in engaging in casino gambling would consider these statements important.

95. Defendants and their co-conspirators have had unique (if not exclusive) access to information relating to gamblers' behavior and, more broadly, the risks and consequences of casino gambling, and have made public promises to be forthcoming with such information, but instead have made misleading, partial, or false disclosures relating to such information.

96. Defendants and their co-conspirators made their fraudulent misrepresentations and omissions intending to deceive consumers, members of the public, and governmental or judicial authorities, and to induce them, including Mr. Ehmann, to believe that casino gambling is honest and highly regulated in such an effective way that guarantees integrity, and that casino gambling comprises games of skill, and that the only risks in casino gambling are those which every consumer is fully informed of and consents to by virtue of his voluntary participation in casino gambling, and to believe that the risks of casino gambling are not unreasonably or unforeseeably dangerous to consumers' financial or mental health, or to society as a whole.

97. Defendants and their co-conspirators, by their lengthy record of false and misleading representations, intended to create a false controversy about casino gambling and to induce consumers, including Mr. Ehmann, to gamble in casinos.

98. Defendants and their co-conspirators have intended to discourage consumers, including Mr. Ehmann, from reducing both the frequency of their casino gambling and the sums of money they wager on casino gambling, and from trying to quit casino gambling altogether. Members of the public believed in the truth and completeness of the statements made by Defendants and their co-conspirators. They relied upon the statements by Defendants and their co-conspirators, including statements that created a false controversy about the risks of gambling, its addictiveness, severity, and rates of problem gambling, and demonstrated that reliance by engaging in casino gambling and by refraining from trying to quit or reduce their level of casino gambling. The belief in and reliance upon Defendants' and their co-conspirators' representations by members of the public was intended by Defendants and was both justifiable and reasonable.

99. As a direct and proximate result of the fraudulent misrepresentations, omissions, and concealment by Defendants and their co-conspirators, individually and collectively, members

of the public, including Mr. Ehmann, began to gamble in casinos and continued doing so, until inordinate numbers of casino gamblers, including Mr. Ehmann, suffered unreasonable, excessive, and unforeseen consequences of casino gambling and continued casino gambling, and as a result, they suffered undue harm. Consumers have sustained numerous and broad-ranging injuries including but not limited to immediate financial losses, permanent long-term financial damage, mental and emotional distress, loss of professional and personal relationships, and suicide.

100.     Defendants' affirmative and intentional acts of fraudulent concealment, suppression, and denial of the facts as alleged above has continued unabated over a span of decades. Defendants have maintained a unified scheme to thwart public awareness of adverse social and scientific information concerning the risks and consequences of casino gambling by suppressing and subverting social and scientific research. Defendants have concealed the actual odds of winning casino games, concealed their manipulation of casino games' addictiveness, and denied that casino gambling is inherently addictive, while marketing casinos as offering "exciting" "games" providing "entertainment" in which gambling outcomes are determined by "skill", all through an uninterrupted pattern of fraudulent and deceitful conduct aimed at maintaining a market for their industry and increasing profits at the expense of consumers, including Mr. Ehmann, whom they endeavored to deceive.

101.     Defendants and their co-conspirators have committed countless acts involving material fraudulent misrepresentations, fraudulent concealment, and fraudulent nondisclosures over the course of at least the last 25 years, by various means including wire transmissions and distribution through the mail. Defendants' and their co-conspirators' acts of concealment took a number of forms, many of which are unknown to Mr. Ehmann because such actions and concealment are within the exclusive knowledge of Defendants and have not yet been either publicly reported or exposed through discovery in the context of litigation. Mr. Ehmann is unable to fully allege in detail the numerous advertisements, press releases, and other communications that Defendants and their co-conspirators have released and engaged in over the past 25 or more years because Mr. Ehmann does not have access to all of this information. However, Defendants themselves are in the best position to know the contents of each and every such misrepresentation and fraudulent statement, and act or omission committed in furtherance of the Enterprise. Specific examples of the material

fraudulent misrepresentations, fraudulent concealment, and fraudulent nondisclosure of Defendants and their co-conspirators include, but are not limited to, the acts set forth in this Complaint.

102.     In violation of Nevada law, Defendants have engaged in multiple transactions involving fraud or deceit in the course of their enterprise and occupation, knowingly and with the intent to defraud, and have engaged in numerous acts, practices, and courses of business, and have employed devices, schemes, and artifices, which have operated as a fraud or deceit upon consumers, including Mr. Ehmann, by means of false representations and omissions of material facts that Defendants have known to be false or to have omitted; intended other persons, including Mr. Ehmann, to rely on; and which have resulted in losses to persons, including Mr. Ehmann, who have relied on the false representations and omissions.

## COUNT TWO
## Liability Under RICO

103.     Plaintiff reasserts and incorporates by reference the allegations and facts set forth above as if fully set forth herein.

104.     Beginning no later than 1994 and continuing up until today, Defendants and others known and unknown, being persons employed by and/or associated with the Enterprise described herein, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of that Enterprise, which was engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity comprising numerous acts of racketeering in Nevada and elsewhere, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud), including, but not limited to, the acts of racketeering alleged in this Complaint and which are incorporated by reference and realleged as if fully set forth herein, which Defendants have committed in violation of 18 U.S.C. § 1962 (c) and (d), which makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity", or to conspire to do so.

105.     The formation, existence, and actions of the Enterprise were essential to the success of the campaign of deceit, concealment, and misinformation. The constituent members of the Enterprise were aware that, unless they agreed to act and acted as an enterprise, the revenue of their gambling business would substantially decrease and, accordingly, Defendants' profits would substantially diminish. The participants were also aware that, if the truth about the risks and addictiveness of casino gambling, and Defendants' false and deceptive marketing – including their intentional efforts to market casino gambling toward children – became known, Defendants' profits would have substantially decreased, and the future of the casino industry would be threatened.

106.     At all relevant times, the Enterprise has existed separate and apart from Defendants' racketeering acts and their conspiracy to commit such acts. The Enterprise has, by the admission of its participants, an ascertainable structure and purpose beyond the scope and commission of Defendants' predicate acts. It has, by the admission of its participants, a consensual decision-making structure that is used to coordinate strategy, manipulate scientific data, suppress the truth about the risks and consequences of casino gambling, and otherwise further defendants' fraudulent scheme.

107.     The Enterprise is an ongoing organization whose constituent elements function as a continuing unit in maximizing the sales of the products of the Defendants, misleading the public and governmental and judicial authorities as to the risks of casino gambling, concealing and suppressing the truth concerning the addictive properties of casino gambling, and of Defendants' marketing to children, and carrying out other elements of Defendants' scheme. The Enterprise actively continues to disguise the nature of Defendants' wrongdoing and to conceal Defendants' participation in the wrongful conduct of the Enterprise in order to avoid and/or minimize their exposure to criminal and civil penalties and damages.

108.     The discovery phase of trial will be necessary to sufficiently and accurately detail the intricate, interlocking, and overlapping web of entities, affiliations, research groups, funding mechanisms, and repositories for gambling industry information which Defendants established, utilized, funded, and/or staffed, in order to achieve their goals.

109.     The pattern and practice of Defendants' conduct reflects not only clear consciousness of guilt, but an unwillingness to concede, and affirmative efforts to conceal from the public and from governmental or judicial authorities, including regulatory bodies, pertinent and properly available information concerning the dangers of casino

gambling. After a span of decades, it would be unreasonable to believe that Defendants will ever voluntarily cease their unlawful conduct, or that their pattern of racketeering activity will cease without intervention by this Court.

110.     Unless restrained, Defendants will continue their attempts to keep internal information from public disclosure. They will refuse to admit, and continue to conceal, the actual risks and consequences of casino gambling, including the fact that Defendants willfully engineer and deceptively market casino gambling for the benefit of themselves and at the expense of the public, including Mr. Ehmann. Affirmative relief is required to ensure that Defendants fulfill their duty to disclose non-public information over which Defendants have exclusive control, and which is crucial to the public in making informed decisions. Equitable relief is necessary to ensure an end to Defendants' continued efforts to confuse and mislead the public concerning the risks, consequences, and addictive nature of casino gambling.

111.     To establish RICO liability, Plaintiff asserts that the evidence will prove the necessary elements of RICO itself — including the existence of an enterprise and a pattern of racketeering activity pursuant to 18 U.S.C. § 1962(c) — as well as the elements of the underlying conduct constituting the racketeering acts, i.e., numerous instances of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

112.     Defendants' violations of RICO, and their continuing pattern of racketeering acts, will continue in connection with the affairs of the Enterprise unless this Court implements the relief requested below.

## CLAIM FOR RELIEF

WHEREAS, Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein and reasserts that Defendants' conduct as described in this Complaint is in clear violation of both Nevada Revised Statute 205.377 and the federal RICO Act.

THEREFORE, Plaintiff requests that this Court grant the following relief:

Pursuant to Nevada Revised Statutes, Chapters 598.0903 to 598.0999, inclusive, and the provisions of 18 U.S.C. § 1964, award damages plus appropriate interest to Plaintiff for Defendants' tortious and wrongful acts as alleged above, as follows:

1. Award Plaintiff money damages for an amount that is sufficient to repay Plaintiff for all harm including economic harm Plaintiff has suffered, including the sums he lost when gambling in Defendants' casinos beginning in about April of 2002 and up to and including April of 2018, totaling, with the inclusion of liquidated damages, threefold the amount of Plaintiff's actual damages;

2. Award Plaintiff the costs of this suit including any attorney fees he has incurred, together with such other and further relief as may be necessary and appropriate.

Pursuant to the provisions of 18 U.S.C. § 1964, issue an Order and Judgment, jointly and severally, against Defendants, providing the following relief:

1. Order that the Defendants who are found to have violated 18 U.S.C. § 1962, disgorge all proceeds derived from any violation of 18 U.S.C. § 1962.

2. Issue a permanent injunction that will do the following:

a. Prohibit Defendants and all persons in concert with Defendants from committing any act of racketeering, as defined in 18 U.S.C. § 1961(1), and from associating directly or indirectly, with any other person known to them to be engaged in such acts of racketeering or with any person in concert or participation with them.

b. Enjoin and restrain Casino Companies and all persons in concert with Casino Companies from participating in any way, directly or indirectly, in the management and/or control of any of the affairs of AGA or NCRG, or, if either AGA or NCRG has been or becomes dissolved, any successor entities of AGA or NCRG, or any other entity affiliated with AGA or NCRG, known to them to be, or have been, engaged in acts of racketeering, and from having any dealings about any matter that relates directly or indirectly to the management and/or control of AGA or NCRG, or any successor or affiliated entities known to them to be, or have been, engaged in acts of

racketeering, or any successor or affiliated entities formed for substantially the same purpose as the AGA or NCRG.

c. Enjoin Defendants and all persons in concert with Defendants from making false, misleading or deceptive statements or representations concerning casino gambling, or gambling in general.

d. Prohibit Defendants and all persons in concert with Defendants from engaging in any public relations endeavor that misrepresents, or suppresses information concerning, the risks associated with casino gambling, and from associating with, or directing, any other persons for the purpose of engaging in such conduct.

e. Order Defendants and all persons in concert with Defendants to disclose, disseminate, and make available to such public and regulatory authorities as the Court may select, all documents relating to research previously conducted directly or indirectly by themselves and their respective agents, affiliates, servants, employees, officers, directors, owners, and all persons acting in concert with, or at the direction of, Defendants, and which relate to the risks of casino gambling or gambling in general, or to the marketing or promotion of casino gambling.

f. Order Casino Companies to fund, but have no part of, or influence over the control of, or decision-making power relating to, a legitimate and sustained corrective public education campaign, administered and controlled by an independent third party comprising no current or former casino industry executives, employees, owners, or investors, relating exclusively to the risks of casino gambling.

g. Order Casino Companies to make corrective statements regarding the risks of casino gambling, and the addictive nature of casino gambling, in all future advertising, marketing, and promotion of casino gambling.

h. Order Casino Companies to fund but have no part of, or influence on, or decision-making power relating to, sustained gambling cessation programs.

i. Order Casino Companies to fund but have no part of, or influence on, or decision-making power relating to, a sustained educational campaign for and directed toward

children, with the sole purpose of deterring children from casino gambling and gambling in general.

3. Award Plaintiff the costs of this suit, including any attorney fees he has incurred, together with such other and further relief as may be necessary and appropriate to prevent and restrain further violations of 18 U.S.C. § 1962, and to end the ongoing wrongful conduct of Defendants.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all triable issues.

Respectfully submitted this 15th Day of July 2019

Eric Ehmann, Plaintiff, pro se

PO Box 2366

Appleton, WI 54912

Case 2:19-cr-00214-JAD-DJA Document 1-1 Filed 07/17/19 Page 33 of 33

Misuse may be a violation of federal law.

This package is not for resale. It is recorded solely for use in sending Priority Mail® shipments.

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED

UNITED STATES
POSTAL SERVICE ®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE



PRIORITY
★ MAIL ★

FROM:

FROM: ERIC EHMANN
PO BOX 8366
APPLETON WI 54912

TO: CLERK, US DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION
333 S. LAS VEGAS BLVD
LAS VEGAS NV 89101

Label 228, March 2016          FOR DOMESTIC AND INTERNATIONAL USE

Retail

UNITED STATES
POSTAL SERVICE.

US POSTAGE PAID
$7.35

Origin: 54911
07/15/19
5802600943-20

PRIORITY MAIL 2-Day®

0 Lb 8.30 Oz          1006

C075

EXPECTED DELIVERY DAY: 07/17/19

SHIP
TO:
333 LAS VEGAS BLVD S
LAS VEGAS NV 89101-7065

USPS TRACKING NUMBER



9505 5124 8736 9196 7824 66

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

PRIORITY
MAIL

UNIT
POST

* Date of delivery specified
* USPS TRACKING™ include
  international destinations.
* Limited International Insuran
* Pick up available.*
* Order supplies online.*
* When used internationally, a customs
  declaration label may be required.

* Domestic only

♲ This envelope is made from post-consumer waste. Please recycle - again.